UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**THOMAS MERCK,**

    **Plaintiff,**

  v.

**WALMART INC.,**

    **Defendant.**

:

:

:

Case No. 2:20-cv-2908
Judge Sarah D. Morrison
Magistrate Judge Elizabeth A.
Preston Deavers

## OPINION AND ORDER

Thomas Merck applied to work at Walmart in 2016. Although Merck did not disclose a prior misdemeanor in his application, the conviction surfaced on a background report. Merck's report was flagged with a code, "R3", indicating failure to disclose criminal history. Had Merck disclosed the misdemeanor, he would have been hired. But the R3 code made him un-hirable under Walmart policy. So, in accordance with the Fair Credit Reporting Act ("FCRA"), Walmart sent Merck a notice of his rights and a copy of his background report—but the report Walmart sent did not include the R3 code. Merck claims that Walmart's conduct violated the FCRA.

The matter is now before the Court on Walmart's Motion for Summary Judgment (ECF No. 104) and Merck's Motion for Class Certification (ECF No. 101). Because Merck fails to establish that he has Article III standing under *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021) and *Ward v. Nat'l Patient Account Servs.*

*Sols., Inc.*, 9 F.4th 357 (6th Cir. 2021), Walmart's Motion for Summary Judgment is **GRANTED** and Merck's Motion for Class Certification is **DENIED as moot**.

I.     **FACTUAL BACKGROUND**

The facts giving rise to this action are largely undisputed.

On April 23, 2016, Thomas Merck applied for a job at the Walmart store in Coshocton, Ohio. (Merck Dep., ECF No. 105-3, 78:16–79:7.) Inside of four weeks, he was invited for an interview. (*Id.*, 83:18–20.) The interviewer told Merck "that everything looked really good. She didn't see a problem why [he] would not be hired[,]" but advised that "they had to do a background check as a formality. As soon as that came back [he] would be contacted with a schedule to start." (*Id.*, 84:14–19.) In other words, Walmart extended Merck a conditional job offer. (ECF No. 104, PAGEID # 2021.) Merck then completed a background check authorization form and a "Criminal History Addendum." (Merck Dep., 85:7–8, 87:18–88:22; ECF No. 104-3, PAGEID # 2076–77.) Merck checked a box on the Criminal History Addendum indicating that he had not been convicted of any crimes. (Merck Dep., 88:21–22.)

Walmart then ordered a background report from its vendor, Sterling Infosystems, Inc. (*See* ECF No. 101-9, PAGEID # 1834.) The background report revealed that Merck had been convicted of misdemeanor theft in 2001. (*Id.*, PAGEID # 1838.) Per the agreement between Sterling and Walmart, Sterling compared Merck's background report to his Criminal History Addendum. (ECF No. 102-4, ¶ 4–5.) The agreement directed Sterling to "score as Not Competitive" any applicant whose background report shows a conviction but who "did not self-disclose

2

any information at all on the consent form[.]" (*Id.*) Because Merck met those two criteria, Sterling scored him as Not Competitive—meaning that he did not pass the background check. Had Merck self-disclosed the 2001 conviction on the Criminal History Addendum, he would have passed. (ECF No. 105-1, PAGEID # 2126.)

On June 6, 2016, Sterling sent Merck the report and a description of his rights (the "Pre-Adverse Action Notice"), as required under the FCRA.[1] (ECF No. 104-3, PAGEID # 2079–81.) On the version of Merck's background report visible to Walmart, Sterling included a Grade Description of "R3":

> Score Report - County Record      MERCK, THOMAS      Complete  Deferred without Additional Review
>
> Grade Description: R3
>
> Not Competitive

(ECF No. 101-9, PAGEID # 1835; ECF No. 104-3, PAGEID # 2079.) Walmart understood the R3 code to mean "that an item was found that was not self-reported

---

[1] The FCRA provides at 15 U.S.C. § 1681b(b)(3)(A):

> [I]n using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action shall provide to the consumer to whom the report relates—
>
> (i) A copy of the report; and
> (ii) A description in writing of the rights of the consumer under this subchapter[.]

3

by the candidate." (ECF No. 102-5, PAGEID # 1959.) But on the version included in Merck's Pre-Adverse Action Report, no Grade Description appears:

```
Score Report - County Record      MERCK, THOMAS                    Complete      Alert
Not Competitive
```

(ECF No. 101-10, PAGEID # 1847.) Merck was told only that the "background report includes public record information that is likely to have an adverse effect on [his] ability to obtain employment with Wal-Mart." (*Id.*, PAGEID # 1841.) Sterling sent Merck a final Notice of Adverse Action eight days later. (*Id.*, PAGEID # 1851.)

Between receiving the Pre-Adverse Action Notice and the Notice of Adverse Action, Merck called either Sterling or Walmart (he does not recall which) to ask for the specific reason why he was not hired. (Merck Dep., 98:14–24.) He later testified:

> I honestly don't remember what I was told. I do remember I had a general sense of confusion because I still did not have an answer to my question.

(*Id.*, 99:1–4.) He further testified that, had he seen the R3 code on his background report, he would have asked what it meant. (*Id.*, PAGEID # 2325.)

Merck applied for positions at Walmart again in August and November of 2016. (ECF No. 101-2, PAGEID # 1600.) Neither application resulted in an interview. (*Id.*, PAGEID # 1600–01.)

## II.     PROCEDURAL HISTORY

Merck filed this action, on behalf of himself and a putative class, on June 3, 2020. (ECF No. 1.) The operative Amended Complaint was filed just two months later. (ECF No. 16.) The Amended Complaint asserts a single claim for violation of

4

the FCRA's pre-adverse action notice requirement. *See* 15 U.S.C. § 1861b(b)(3)(A). Walmart moved to dismiss the Amended Complaint, arguing that Merck failed to allege injury-in-fact sufficient to confer Article III standing, and otherwise failed to allege a timely claim for relief. This Court denied Walmart's motion on March 24, 2021. (ECF No. 37.) The parties then engaged in substantial discovery before filing the motions *sub judice*.

### III. MOTION FOR SUMMARY JUDGMENT

#### A. Standard of Review

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.

5

1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

### B. Analysis

Walmart argues that it is entitled to judgment as a matter of law because (i) neither Merck nor the putative class members have Article III standing; (ii) Merck released his claim against Walmart in a settlement agreement with Sterling; (iii) Merck's claim is time-barred, as are the claims of many putative class members; and (iv) Merck fails to provide evidence that Walmart willfully violated the FCRA, as required to support a claim for statutory damages. Because Walmart's first argument—that Merck lacks Article III standing—is well-taken and dispositive, the Court does not address the others.

The jurisdiction of federal courts is confined to "Cases" and "Controversies." U.S. CONST. ART. III, § 1. Cases and controversies "of the justiciable sort" are those in which the plaintiff demonstrates "standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Supreme Court has long recognized "that the irreducible constitutional minimum of standing contains three elements." *Id*. "First and foremost," the plaintiff must show an injury in fact that is concrete and particularized. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). Second, he must show that the injury was caused by the conduct complained of. *Lujan*, 504 U.S. at 560.

6

And, third, he must show that the injury is redressable by a favorable decision. *Id.* at 560–61. The plaintiff must establish Article III standing "in the same way as any other matter on which the plaintiff bears the burden of proof." *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th 357, 360–61 (6th Cir. 2021) (quoting *Lujan*, 504 U.S. at 561). And so, on summary judgment, a plaintiff must "set forth specific facts demonstrating" standing—he "cannot rely on mere allegations." *Id.*

The parties dispute whether Merck has demonstrated an injury-in-fact sufficiently concrete to establish Article III standing. Merck points to the March 24, 2021 decision denying Walmart's Motion to Dismiss, in which this Court found that he adequately alleged a concrete injury—namely, the inability to explain "true but negative" information in the background report. (ECF No. 37.) Walmart argues that the law, as it has since been clarified, no longer supports that conclusion. The Court agrees with Walmart.

1.  **Recent Case Law**

Since this Court denied Walmart's motion to dismiss Merck's claim for lack of standing, the Supreme Court and the Sixth Circuit Court of Appeals have addressed the requirement that a plaintiff suffer a concrete injury resulting from a violation of procedural rights under statute. The Court begins with a review of those decisions.

a)  *Spokeo, Inc. v. Robins*

The most recent jurisprudence is rooted in the Supreme Court's 2016 decision in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). There, the Court considered whether Robins alleged a concrete injury in his complaint against Spokeo, a "people search

7

engine" that compiled an inaccurate profile of Robins by scraping internet sources. *Id*. at 336. Robins argued that Spokeo's methods violated the FCRA's requirements for consumer reporting agencies. *Id*. The Ninth Circuit found that Robins adequately alleged a concrete and particularized injury, but Spokeo believed that concreteness was lacking.

The Supreme Court explained that an individual's right to sue under a statute (statutory standing) is triggered when the statute is violated, but his right to have the claim heard by a federal court (Article III standing) is not triggered until the violation results in concrete harm. *Id*. at 338–42. Where a statute protects a *substantive* interest, statutory and Article III standing may trigger at once. As an example, federal statutes prohibit employers from terminating employees because of race. The statute protects an employee's substantive interest against being the subject of race discrimination. If the employee is terminated because of race, she has both statutory standing and Article III standing because the statute's violation itself caused concrete injury. But where a statute protects a *procedural* interest, there is no Article III standing unless and until the statutory violation actually injures the plaintiff. In other words, a plaintiff "could not . . . allege a bare procedural violation [of a statute], divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id*. at 341.

Concrete harm resulting from the violation of a procedural statute is easiest to identify when it is tangible—for example, a pecuniary or physical loss. *Id*. at 340. But an intangible harm can also be concrete. *Id*. "In determining whether an

8

intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Id*. The Supreme Court has instructed lower courts to consider whether the alleged harm has (i) a close relationship to the harm Congress sought to avoid in passing the statute and (ii) "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit." *Id*. at 340–41. This framework acknowledges that Congress can establish new causes of action, "defin[ing] injuries . . . where none existed before[,]" i*d*. at 339 (quoting Raines v. Byrd, 521 U.S. 811, 820, n.3 (1997)), but identifies Article III as the outer boundary of that power. Congress may not "statutorily grant[] the right to sue to a plaintiff who would not otherwise have standing." *Id*. at 341 (quoting *Lujan*, 504 U.S. at 580 (Kennedy, J., concurring)).

The Supreme Court did not decide whether Robins had Article III standing. Instead, it found that the Ninth Circuit erred by failing to consider whether Spokeo's alleged FCRA violation resulted in any concrete harm to Robins. *Id*. at 342–43. The case was remanded for further proceedings.

### b) *TransUnion LLC v. Ramirez*

Five years later, the Supreme Court elaborated on the framework introduced in *Spokeo*. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190 (2021). Sergio Ramirez had been unable to purchase a car after TransUnion flagged his credit report because he shared the name of an individual on a government list of terrorists and narcotics traffickers. *Id*. at 2201. Ramirez filed a class action alleging that TransUnion twice violated the FCRA: first by using inadequate procedures for verifying the accuracy

9

of information placed on consumer reports; and second, by failing to send certain required notices in a single envelope. *Id.* at 2202.

Returning to the *Spokeo* framework, the Supreme Court identified the interests Congress sought to protect vis-à-vis the FCRA—namely, accuracy of consumer reports and consumer privacy. It then evaluated whether each alleged violation resulted in an injury with a close relationship to a traditionally recognized harm by seeking "a close historical or common law analogue for [the] asserted injury." *Id.* at 2204–07.

*Accuracy-checking procedures.* As to the claim based on TransUnion's procedures for verifying the accuracy of reported information, the Supreme Court distinguished class members whose consumer reports were disclosed by TransUnion to a third party, from those whose consumer reports did not leave TransUnion's internal files. *Id.* at 2210. The former sub-class of plaintiffs suffered a harm analogous to common-law defamation and, thus, had standing to sue. *Id.* at 2209. The latter sub-class was unable to analogize their injury to defamation, because "[p]ublication is 'essential to liability[.]'" *Id.* (quoting Restatement (First) of Torts § 577 cmt. a). The Court considered whether any other common law analogue makes "the mere existence of inaccurate information, absent dissemination, amount[] to concrete injury," but concluded there was none. *Id.* (quoting *Owner-Operator Indep. Drivers. Ass'n, Inc. v. U.S. Dep't of Transp.*, 879 F.3d 339, 344–45 (D.C. Cir. 2018)). The Court next considered whether the existence of inaccurate information in the class members' credit files posed a "risk of future harm" sufficient to confer Article

10

III standing, but concluded it does not. *Id*. at 2210. While *Spokeo* had left open the possibility that a risk of future harm could "sometimes 'satisfy the requirement of concreteness[,]'" *id*. (quoting *Spokeo*, 578 U.S. at 341–42), the *TransUnion* Court confined that possibility to a suit for injunctive relief, holding:

> [I]n a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm—at least unless the exposure to the risk of future harm itself causes a separate concrete harm.

*Id*. at 2210–11. Because the sub-class had not demonstrated that "the risk of future harm materialized" or that "class members were independently harmed by their exposure to the risk itself," they lacked Article III standing. *Id*. at 2211.

*Format of notices*. The Court followed the same framework to determine whether plaintiffs had Article III standing to maintain their claim based on TransUnion's improper formatting of FCRA-required notices. The Court first acknowledged the notice requirement's legitimate purpose "to protect consumers' interests in learning of any inaccuracies in their credit files so that they can promptly correct the files before they are disseminated to third parties." *Id*. at 2213. But without alleging any downstream consequences of the improper formatting, Plaintiffs' injury was simply a deprivation of "their right to receive information in the format required by statute." *Id*. That harm is not closely related to "a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id*. Nor does it pose a risk of future harm sufficient to confer standing. *Id*. at 2214. Thus, the Court found a "bare procedural violation, divorced from any concrete harm," which does not confer Article III standing. *Id*.

11

### c) *Ward v. National Patient Account Services Solutions, Inc.*

The Sixth Circuit first applied *TransUnion* in *Ward v. National Patient Account Services Solutions, Inc.*, 9 F.4th 357 (6th Cir. 2021). There, the court considered whether Ward suffered a concrete injury when the defendant, a debt collection agency, identified itself as NPAS—and not NPAS*, Inc.*—on Ward's voicemail. The omission caused Ward to send a cease-and-desist letter to a different, but similarly-named, debt collector, NPAS Solutions, LLC. Unsurprisingly, the debt collection calls did not cease. *Id*. at 360. The court discussed the law on injury-in-fact, and found that its own post-*Spokeo* understanding had been abrogated by *TransUnion*:

> In the wake of *Spokeo*, the circuit courts developed different tests to determine whether the violation of a procedural right was sufficient to establish a concrete injury. *Compare Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747 (6th Cir. 2018), *with Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329 (7th Cir. 2019). In *Macy*, we held that the plaintiffs satisfied the concreteness requirement where "[Fair Debt Collection Practices Act ('FDCPA')] violations created a material risk of harm to the interests recognized by Congress in enacting the FDCPA." 897 F.3d at 761.
>
> Recently, the Supreme Court abrogated that holding, finding that "in a suit for damages, the mere risk of future harm, standing alone, cannot qualify as a concrete harm." *TransUnion*, 141 S. Ct. at 2210–11. Rather, plaintiffs must demonstrate that the "the risk of future harm materialized," or that the plaintiffs "were independently harmed by their exposure to the risk itself." *Id*. at 2211.

*Id*. at 361.

The Sixth Circuit then read *Spokeo* and *TransUnion* together to distill a "basic guidepost" for its analysis:

12

> Ward does not automatically have standing simply because Congress authorizes a plaintiff to sue a debt collector for failing to comply with the FDCPA. Ward must show either that the procedural harm itself is a concrete injury of the sort traditionally recognized or that the procedural violations caused an independent concrete injury.

*Id*. In that case, the alleged violation was not itself a concrete injury of the sort traditionally recognized. *Id*. at 362. While a plaintiff's "common-law or historical analogue need not be an 'exact duplicate'" to confer Article III standing, Ward's alleged harm "d[id] not closely resemble" an invasion of privacy, as he had proposed. *Id*. The court next found that Ward failed to establish any concrete injury flowing from the alleged statutory violation. *Id*. at 363. Ward principally argued that he was confused by the voicemails, and that his confusion supported Article III standing. But the court pointed out that "confusion alone is not a concrete injury for Article III purposes." *Id*. (citing *Garland v. Orlans, PC*, 999 F.3d 432, 437–38 (6th Cir. 2021); *Pennell v. Global Tr. Mgmt.*, LLC, 990 F.3d 1041, 1045 (7th Cir. 2021)). Because Ward "failed to show more than a bare procedural violation of the FDCPA," he lacked Article III standing. *Id*.

        **2.**      **Application**

Merck alleges that Walmart violated the FCRA by failing to disclose the R3 code in the Pre-Adverse Action Notice. His injury, then, is the deprivation of "critical information that Congress determined [he] was entitled to[.]" (ECF No. 103, PAGEID # 2002.) Following the Sixth Circuit's guidepost formulation, this Court now asks: Does Merck show that being deprived information about the R3 code is itself a concrete injury of the sort traditionally recognized? If not, did an independent concrete injury flow from the deprivation?

13

### a) Merck's alleged injury does not closely resemble any traditionally-recognized harm.

Merck first argues that his injury is analogous to the harm redressable at common law by claims for nondisclosure of material information. He cites, for example, the Restatement (Second) of Torts § 551, Liability for Nondisclosure. The Restatement does recognize liability for failure to disclose a fact that the tortfeasor knows may justifiably induce the other to act or refrain from acting in a business transaction. *Id.*, § 551(1). But such liability attaches only when the tortfeasor owes a duty to exercise reasonable care in making disclosures to the other. *Id.*, § 551(1), (2), cmt. a. Merck has not shown that Walmart owed him any such duty. Similar deficiencies defeat Merck's attempts to analogize his claims to common law fraudulent misrepresentation and contract rescission.

### b) Merck fails to show any independent injury flowing from Walmart's alleged violation.

The Court next asks whether an independent concrete injury flowed from Walmart's alleged violation. Merck argues that Walmart's failure to disclose the R3 code made him "unable to avail himself of the opportunity to reapply after making a full disclosure." (ECF No. 101, PAGEID # 1558.) The record evidence reflects otherwise. Merck applied for a position at Walmart in April 2016. Walmart conditionally offered him employment, subject to the results of a background check. Merck consented to Walmart running his background check, but failed to disclose a 2001 misdemeanor conviction. He received the Pre-Adverse Action Notice and inquired into its meaning before receiving the Notice of Adverse Action. Merck would have been hired had he disclosed his conviction—but, because he did not, he

14

was ineligible for hire for a period of 60 days. Merck re-applied for positions at Walmart in August and November 2016. Neither application was selected for an interview, and so no further background checks were ordered. In other words, the Pre-Adverse Action Notice (flawed as it may have been) did not deprive him of the opportunity to re-apply, evidenced by the fact that he did re-apply—*twice.*

Merck re-casts these facts to suggest that Walmart's alleged FCRA violation resulted in his August and November applications being denied. Noting that store-level employees were not told the R3 code's meaning, Merck proposes that the later applications were unsuccessful because "employees at the particular store where [he] was applying recognized his name as someone who had failed a background check, and therefore chose not to reinterview him, thinking he would fail if he reached that step again." (ECF No. 105, PAGEID # 2102.) While this theory is not outside the realm of possibilities, it has not been demonstrated by any evidence.

        c)      ***TransUnion* and *Ward* require the Court to abandon its earlier finding of concrete injury.**

Finally, Merck urges the Court to adhere to its earlier finding that his inability to explain true-but-negative information in his background report is a concrete injury in fact. The Court made that finding after analyzing the statute's text and reviewing case law then available. At the time, the most persuasive decisions held that the FCRA entitled applicants to contextualize their background reports for prospective employers and conferred standing on applicants denied that opportunity. (ECF No. 37, citing, *inter alia*, *Robertson v. Allied Sols., LLC*, 902 F.3d 690 (7th Cir. 2018) and *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 318, 324 (3d

15

Cir. 2018).) But the later-decided *TransUnion* and *Ward* cast significant doubt on that holding. Now, with the benefit of those decisions, this Court concludes that a violation of the FCRA's pre-adverse action notice requirements does not result in concrete harm unless the consumer report was inaccurate or the statutory violation was a but-for cause of the adverse employment action. *See Gray v. Nachus Alpine Sols., LLC*, Case No. 3:21-cv-125, 2023 WL 3004433, at *5 (N.D. Ohio Apr. 19, 2023) (concluding that defendant's failure to provide any pre-adverse action notice was "divorced from concrete injury" because plaintiff did not allege that (i) the consumer report was inaccurate or (ii) defendant would have hired plaintiff had she received the required notice); *Schumacher v. SC Data Ctr., Inc.*, 33 F.4th 504, 512 (8th Cir. 2022) (same); *Davis v. Universal Protection Servs., LLC*, 558 F. Supp. 3d 220, 227–28 (E.D. Pa. 2021) (same, after noting that "*TransUnion* raised the bar" to establish Article III standing). Here, it is undisputed that Merck's consumer report was accurate—he was in fact convicted of misdemeanor theft in 2001, and failed to disclose the conviction on his Criminal History Addendum. It is also undisputed that Walmart would not have hired Merck in June 2016, even if he had explained that the omission was an honest mistake.

Merck thus fails to carry his burden to set forth specific facts demonstrating Article III standing. Walmart's Motion for Summary Judgment is **GRANTED**.

IV. **MOTION FOR CLASS CERTIFICATION**

In view of the Court's decision, the Motion for Class Certification is **DENIED as moot**. *TransUnion*, 141 S.Ct. at 2208 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not.") (quoting

16

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) (Roberts, C.J., concurring)).

## V. CONCLUSION

For the reasons set forth above Walmart's Motion for Summary Judgment (ECF No. 104) is **GRANTED**. Merck's Motion for Class Certification (ECF No. 101) is **DENIED as moot**.

The Clerk is **DIRECTED** to **TERMINATE** this case from the docket.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**